Number 171965 and number 171966, Carmelo Esteban Velazquez-Aponte. Good morning, Ms. Val Dorado. Good morning, Your Honor. Your Honor, I would like to reserve two minutes. You may. Thank you. May I begin? From the moment of arrest on June 20, 2011 to the date of the report that is found in the sealed appendix, four years, more than four years elapsed in a process where Carmelo Velazquez was submitted to evaluations, treatment, medication, evaluation, treatment, medication. Not at one institution, but at multiple institutions of the Bureau of Prisons. It was not until a combination of medications, five psychotropic medications were prescribed to him at the final mind, in a concrete, competent position to come back and stand trial. Counsel, you seem to suggest that the court was inattentive to his medication history, the condition that he was in at trial, but there was a lot of attention paid to that. I mean, the psychiatrist was called to testify. Isn't that correct in this case? And the psychiatrist, as I understand it, testified that the medication regime had remained the same. He testified to the condition that the defendant was in, in terms of his competence to stand trial. I am sorry. The judge made observations about the way in which the defendant was behaving at trial. His attorney indicated that the defendant was working with the attorney through the trial. So all of that was on the record. All of that was done. Is that an overstatement of what happened? I think that there are many issues. I have many issues with that statement, Judge Lippis. Yes. And I will take them in order. First of all, yes, the court was attentive. Was the attention that the court gave to the problem the appropriate attention, and did he ask the appropriate questions to be able to have a record that supported that this client was competent to stand trial? That's the first thing. Second, we do not know if Dr. Lopez was a psychiatrist. Dr. Lopez is the medical director for the Metropolitan Detention Center, but nothing in the record states that Dr. Lopez was a psychiatrist or a podiatrist or anything else. We don't know because nobody asked Dr. Lopez what her qualifications were to give an opinion. Next, no, not all the medications were being given. Dr. Lopez testified that only two of the medications of the five that were the winners, and I have to keep giving emphasis to that, the district court was so conscious of what was the combination of medications that had to be given to this man for him to be competent to stand trial that he called them the winners. He issued an order to the Metropolitan Detention Center that these five medications, that that dosage could not change. And then during the trial, when it was obvious that the dosage had changed, that the medications were not being given, that the combination was not being given, he never asked, is this something that affects the defendant's competence to stand trial? Can anybody ask the defendant? Should I, as a judge, ask the defendant, how are you feeling? Are you understanding what's going on? How are the medications affecting you? Mr. Matos, do you think that your client is understanding? Do you think that the medications are being affected? If you calm this record, you will not find one place where anybody asks, is the defendant understanding what's going on and are the medications, the titration of the medications, the fact that the medication from day three of the trial to day end of the trial were being increased by the medical staff at MDC. Why not? Well, again, we don't know if it was a psychiatrist treating him. So I am sorry, but I cannot agree with you and with your characterization of the record. That is not what happened. That is not what's in the record. And I would be remiss not to mention that if you The medical director would have been the overall person responsible for the medical care of the inmates. That is correct. Is that correct? And therefore, that person would have been responsible for ensuring the general health as well as the competency of the inmates. And didn't she, during her testimony, yes, she said that she was, that the defendant was given three as opposed to five and two were the same and the other one wasn't, if I recall correctly. But didn't she also say that she was monitoring or that the prison was monitoring and that the defendant was stable and competent? If, this is what, I have it here because I brought the whole record. If And isn't Dr. Lopez a woman? I just want to call about a right pronoun. Dr. Lopez said that they were going to increase the medication and Dr. Lopez said, she sort of restated what the medical evaluation said, what his disorder was. But I don't remember on this record that she said that she would be monitoring him as a psychiatrist would be, only as what a medical director would do. I'm sorry. And what she did say was that she went to the holding cell to talk to him. That's what she said on the record. Not that she was monitoring him at MDC, but that she went to the holding cell and that is at page 8 of your fourth day of trial, which is July 1st. And she said, she even said in support of the fact that he understood, because she did say he knows what's going on. Yes, but there is a difference between knowing what's going on and understanding and knowing and being competent to assist in your defense. And that point is what I wanted to interrupt you on. My impression is that it was the defendant who brought the lack of medical attention initially to the court and several times thereafter. His attorneys said that he had told them that he was not being given his medication. Does that have any relevance to this issue? I think that not in the way that would favor the district court. Why not? I mean, if he's competent enough to be able to keep track of his medicines and state that he's not being given the proper treatment, it seems to me he's pretty much aware of what's going on. Well, awareness that you are not being medicated can be equated really to being competent to assist in your defense. And the response that I would have to you on that is that it doesn't change my argument. Because the issue here is that there was going to be an active fluctuation of that medication during the trial. They were going to be increasing the medication during the trial. And from the date that the district court finds out that there is going to be this increase, this fluctuation, this variation during the trial of the medications that he was being given, which, by the way, are not the winners, nobody asked whether he was competent. And in that final exchange between the defendant and the defense attorneys and the court, on the last day of trial when he was being asked, are you going to put up any evidence, are you going to testify, what he, what the defendant says is, I don't know if I am understanding. Counsel, you mentioned it was a long time between the arrest and the trial. You said four years or more, is that correct? More than four years. And was it, given your understanding, your understanding of the record, was it because of ongoing concerns about his competence to stand trial, and so there was this attention given to the kind of medication he needed, and finally, after all this time, all these efforts to stabilize him, a judgment was made, and it's reflected in the record, that at this point he was competent to stand trial. In other words, a lot of attention was given to this issue over the history of this case. Isn't that true? It is true. And it is precisely because of that why the argument is so strong that he was not given for a trial, because after all this attention was given, and after the right combination of medications was found, for him to be competent, to be, let me, allow me a moment, because there is, I mean, he is found to be in a mental state where he is mood stabilized, his mind is clear, his suicidal attempts, his hallucinations, his self-inflicting damage to himself, they are all gone, and he is fine. And when this point is reached, is when he is sent back to MDC Huaynabo, and MDC Huaynabo begins by not medicating him, and then altering all this. And then we have the situation that no questions are asked, no proper inquiry is made by the district court about his competence. When we have all this information, this is not the case. In April last year there was a case from the court which was a plea, and the allegation was nobody asked what the effect of the medication was. And you properly said, we have no record to think that the medication could have done something, there is nothing here. That is the exact opposite of what's happening here. In this case, we have a huge record. We have a reason to believe that we have to guard this man's rights. We have a reason to believe that this is important, and we have a reason to believe that the district court has the responsibility, having all this record of asking the right questions. Of asking whether this is something that is important, whether he is understanding, whether he is competent, and whether we have to stop this trial altogether because MDC messed up the medications. What more should the district court have done that it did not do? What is the essence of your argument, the failures of omission by the district court, what are they? The district court could have asked the attorneys, do you believe that your client is understanding what's going on? Other than he is talking to us and he is discussing with us, is he understanding? Do you believe that the fluctuations in the medications? Please do not lose sight, Judge Lippis, that we are coming from a record where a hearing was held where all these five medications were discussed on the record and were called the winners by the district court. He knows how important these medications are. Did the fluctuation in these medications affect your client's competence? Is your client understanding? At the end of the case, when they are going through the point where they are asking the defendant, and the defendant says, I don't understand. Why did the district court did not ask the attorneys? Please explain on the record what is it that your client did not understand. Did he not understand the whole trial or did he not understand the exchange that we are having now? Was that clarified to him? Did he clarify all his doubts? Did you answer his question? There is nothing there. Before you sit down, there was a forensic report hearing, wasn't there? There was a hearing where the forensic report was discussed. There was a hearing? Yes. And he testified? Yes. And the court found, and I quote the court, he found the defendant articulate, very cool, very reflective with excellent language and excellent expression. Is that relevant here? While he was taking the five medications. And thereafter, he was not getting along with his lawyer and he had a new lawyer appointed. He had an additional counsel appointed, Judge Torolla. Mr. Matos remained in the case throughout the case. There was just an additional attorney appointed. I wouldn't want to belittle his role, but there was an additional attorney appointed just to deal with the defendant. Well, thank you. We'll look at the record again. Good morning, Ms. Meconiatis. Good morning. May it please the court. Julia Meconiatis for the government. Now, the district court did not err, much less plainly so, in its treatment of Velasquez's competency and mental health, both prior and during the trial. Now, I'd like to clarify some factual discrepancies that were brought up. First, Your Honor, to your question about why this case took so long to get to trial, it should be noted that this case originally was a death penalty potential case. And for many years, it was back and forth with a capital crimes unit to see whether the attorney general was going to certify this case as a death penalty eligible case. When it came down that the attorney general was not going to proceed with this case as a death penalty eligible case, that is when Mr. Velasquez's attorney, Mr. Matos, requested the first competency evaluation. And that competency evaluation was ordered by the district court in December of 2014, as stated in the evaluation itself. The evaluation was rendered in November of 2015, and the trial began mid-2016. But first, there was a competency hearing in April. And there is also another issue that is not quite clear, in all honesty, from the court. And that is that Mr. Velasquez was given five different medications. And notwithstanding those five different medications, the forensic psychologist diagnosed him with antisocial personality disorder and said that he was competent. And said that if he wasn't participating with his attorneys, it had nothing to do with his competency, but it was part of his disorder. Fast forward to the hearing in April 18, 2016, where Mr. Velasquez interacted with the court, where, as Judge Torbella noticed, he said that he was cool, articulate, that he was calm, that he noticed that he was able to say what he wanted to say, but because he explained his displeasure in even being sent to a mental competency hearing. At that hearing... And what were the observations that were made during the course of the trial? The part that Judge Torbella referenced, and I am referencing again, is during the April 18th competency hearing. But what's noteworthy of that hearing was that they started it in the morning, and that is when the judge made these observations. How long was that prior to the trial itself? Two months, Your Honor. Then there is a break for lunch, and a second attorney is appointed because Mr. Velasquez was upset that he was sent for the competency, so they bring in Mr. Sanchez, and with Mr. Sanchez, they're getting somewhere. And on the record in the afternoon, Mr. Matos explains, my client is complaining that he hasn't received any medicine since he's come to MDC, and miraculously, three days before this hearing, he's getting his medicine. Now, there's no discussion of what those medications are, so it's not clear from the record if we're talking about the five medications in the report, or the three medications that he was actually on at trial. But regardless of the medications that he was receiving at MDC, the district court made that finding. But that's not all that happened in this case, because if we want to just say, well, let's focus on what happened at trial. The district court had sufficient interactions with the defendant where he was able to gauge his competency, and note that it was the same type of behavior that he had previously seen. And a district's judge appreciation of the demeanor is given some deference here. And I'll go specifically to show the personal interactions that he had with the defendant. On June 27, after the jury was empaneled and opening statements were about to begin, the trial was postponed because a juror did not arrive. However, during that opportunity, the defendant, in court, assisted with a court interpreter. The parties discussed, because the court wanted to know whatever happened to the plea negotiations in this case, to see if there was a possibility of a plea. And that is when Mr. Mato said, no, we never received an offer from the government. The government said, we have no offer. He can straight plea if he wants to. And at that point, the court says, well, what does he want to do? And Mr. Mato says, he wants to go to trial. And he says, no, I want to hear it from your client. And at that point, listening from everything, he wasn't confused. Mr. Velazquez says, I want to go to trial. The next day, again, the topic of medication is being discussed, where Mr. Velazquez tells his attorney, I'm not getting enough medication. The court says, well, I'm going to talk to the warden. And that day, they go together in chambers. What happened in chambers is not on the record, but the next morning, they put it on the record, where they spoke with a warden and they spoke with a psychiatrist in Florida who was saying the medications are going to stay the same. Then we have, on June 30th, again, counsel brings up the claim that he was not receiving proper medication yet again. And he personally, the court personally asks the defendant for consent to speak with his physician. And at that point, the defendant looks at him and said, yes, you may. Yes, you can speak to the doctor. He says, thank you. He says, okay, he's clearly understanding the back and forth of what is going on. The next day, Dr. Lopez, and yes, Your Honor, it is a woman, explained the diagnosis. She explained the diagnosis and that since trial has begun, he has been on the same regimen of medications. Excuse me, defense counsel suggests that the doctor might have been a podiatrist rather than a psychiatrist. Do we know the kind of doctor the doctor was? Your Honor, the record is limited to saying that she's the medical director of MDC and she had brought the file with her. And we have that on June 27th, a court had spoken with a psychiatrist in Florida about these same medications that would remain the same. And when she came in on the first, she said he had been receiving them all in the proper dosage. She met with the defendant. He seemed goal oriented, that he was clear, that he understood what was going on. And she gave an example about how his condition shows that he wants to control the little things, that he wanted to switch seats at counsel's table because within the last two days, over seven people had personally identified him as the perpetrator of the crime. She said that his condition has this type of control and that that's only going to continue. And it did. Prior to closing arguments, the defense attorneys explained that he was demanding two days to discuss the case with them so they could make the arguments. Not only that, even after increasing the anxiety medication, counsel advised to the court that the defendant had been actively participating in his defense and encouraged more participation. So not only do we have the district court see that his behavior remained the same throughout the proceedings, we have defense attorneys, very seasoned defense attorneys in this district, that objected to various part at trial that were able to counsel. Isn't the picture a little more mixed in your suggestion? There were interactions involving the judge and the defendant where the defendant seemed to clearly be confused and indicated, in effect, things are happening that I do not understand. There were instances like that as well, were there not? Yes, Your Honor. There was one instance, and that's the same day that there's the, we need two days to talk about the closing arguments to discuss it. When that happened was after the government closed its case, there was the issue of whether the defense was going to present a case. Mr. Matos said that, no, we're not going to be presenting the case, and the district court inquired whether the defendant was in agreement with this. And at that point he stated, I'm a little confused. And when you look at the gist of that interaction, it shows that, and it's consistent with what his attorneys were saying, that Mr. Velazquez wanted his attorneys to present argumentation. And he even says that my attorneys say that that's argument, not evidence. Now, in most cases, Your Honor, and we have all read various transcripts, a defendant may show some confusion as to what's argument and what's evidence. But that doesn't have to go with his competency. When we look at the cases cited by defendant in his brief, which basically revolves around para y venas, which is a different Rule 11 context where you're giving up constitutional rights and entering into a guilty plea, the relative inquiry, as this court has sharpened it in Llanos-Palero, is does the defendant understand what's going on? And this court has explained that that can be a sufficient inquiry in para y venas. There was no inquiry whatsoever. The court just knew he was on medicines, didn't say anything. This record is vastly different as we have hearings, we have competency evaluations, we have the court viewing him on a day-to-day basis, and we have the defense attorney's appreciation of that. But the questions that this court has found on plain error to be sufficient is, are you okay to proceed with the proceedings? Do you understand what's going on? And it is the government's position that from saying that I want to go to trial, you can talk to my attorney, and then saying, my attorney's explaining to me that that's arguments, not evidence, that he may have shown a little of hesitation. The court asked him, do you remember I told the jury that you don't have to present anything? And he says, you didn't tell me, you told the jury. All of this behavior is consistent with his diagnosis, and nothing on the record supports the claim that he was confused or dizzy or that he was even receiving different meds than he had received at the competency evaluation. Counsel, I wonder if I could just, although opposing counsel did not address it in oral argument, I would like to ask you a question about the presentation of the DNA evidence. Yes, sir. Yes, Your Honor. My impression from the government's briefing is that you seem somewhat loath to defend the way in which that evidence was presented, and you move very quickly to a harmless error argument. Do I misread the government's view of the presentation of that evidence? You don't really seem to defend very much the way in which that evidence went in. Well, Your Honor, in our brief, the preliminary argument we make is a waiver argument, saying that it was not properly presented to the district court, that the citation to Melendez-Diaz is inappropriate, that doesn't help him, because here there is no reports that were entered absent lies testimony, and the individual here that testified was the DNA expert that wrote the report, and the report here wasn't even entered into evidence. So first we have a waiver argument for lack of proper development. Counsel, this is an instance where the expert witness did testify about underlying tests that were done, interpreted those tests, but since she was not the individual who actually did the DNA analysis, defense counsel was not in a position to challenge the way in which that testing was done. Isn't that so? That is correct, Your Honor. Isn't that problematic? Well, what the government did in its briefing, to get to your original question and then to answer this question, was note that currently the Supreme Court case law is unclear how the Confrontation Clause applies to precisely a situation like this, where the underlying lab analysis is used, then by an expert who does the matching. Now, there have been certain, while preparing for this argument, it has been found, for example, that although a defendant may not have an opportunity to cross-examine the lab analysist, excuse me, the lab technician in this case, where the testifying individual is, in this case Ms. Carson, familiar with the laboratory procedures and where she's able to testify about the quality control as the quality assurance manager and her responsibilities, she talked about the different controls using a negative sample and a positive sample. She explained that she reviewed the notes from the biologists here and that there was no indication that that was out of the ordinary. That has been held to have no Confrontation Clause. And I found this case last night, and it's an unpublished decision out of the Ninth Circuit. If Your Honors would like it, I can submit it as a 28-J. But what the government's point is that in other cases where there have been thorny Confrontation Clause issues, this Court has sidestepped it where you don't need to decide this issue because any potential error in this case is overwhelmingly harmless beyond a reasonable doubt. The DNA evidence in this case was merely cumulative. It's not the sole evidence that linked the defendant to all of these crimes. To the contrary, every victim, with the exception of Mr. Gomez, ID'd the defendant as the perpetrator in open court. The two guns that were retrieved from him at his arrest... Did you try this case? Excuse me? Did you try this case? No, Your Honor, I did not. The two guns that were retrieved from him, the first victim's gun and the police officer's gun, were found in his waistband on arrest. The policia hat from Mr. Fardewa's stolen cruiser was found in the mountaineer that he abandoned before he... The police officer saw him abandon it and via Fontana. Officer Rodriguez testified that the person in the security video who shot and killed Richardson Mieses, then picks up his gun and gets in the car, was Mr. Velazquez. Here, Mr. Velazquez was already linked to the crime by a plethora of evidence, including witness identification, his arrest, the presence of firearms, the ballistic analysis, the police hat that was in the mountaineer, the gold chain that he ripped from Mr. Gomez. Since this evidence here otherwise duplicated properly admitted evidence, there is no way that it could have been not harmless beyond a reasonable doubt. And the prosecutor noted this, Your Honor, in closing. I think Judge Leibowitz wants to ask a question. Yes. This goes to the trial on the felon in possession charge, which was a separate trial. A different trial. An issue has been raised, again, a hearsay issue, about the way in which the prior conviction was proven. Can you explain to me, I think one could take the view that the prior record that was introduced was a self-authenticating document, and so there was no need for the kind of testimony that the government offered. Why did the government feel the need to offer the testimony? I think it was Officer Rodriguez. Why did the government do that? Yes, Your Honor. It is stated on the record why the government did that. After the conviction itself was properly entered and there was no objection to that, they called in Rodriguez's testimony, and it's specific on the record, where it says, we don't want him claiming that he's a different Carmelo Esteban Velasquez Aponte, not the one in that record. So that's why they tied it in. So he would say that it's just not another person who happens to have his same name, to say that that can't be another Jose Perez or, you know, a different individual. That's specifically on the record when the objection originally came up. So where, well, I guess you're the wrong one to ask, but where is the, if all she's testifying to is how she knew him, her prior experience with him, where's the hearsay in that? It sounds like she's just describing her personal involvement on a prior occasion with him. I don't see the hearsay. Yes, Your Honor. I guess you probably agree with that. I do agree with that, and that is what the government argued at Sidebar when they were discussing the issue, that she had personal knowledge, that she was one of the people that had investigated him on previous charges of murders. That's how she knew him. That's how she knew that it was the man in the video. Okay. All right. Thank you. Thank you. Thank you, Kelvin. I will use the two minutes to clarify some statements as to the issue that was issue number one, though, one of the medications. This was a death penalty potential case, but throughout the death penalty proceedings that were being conducted where the Department of Justice was trying to decide, the issue of competence was brought up, and you will find at the sealed appendix, which is the report, that this man was undergoing evaluation since arrest, since 2011, 2012. He was referred. Could you spend a little bit of your rebuttal time talking about the DNA? Could you spend a little bit of your rebuttal time talking about the DNA? I will. I just want to clarify that Dr. Lopez never addressed the issue that he had been identified, that he, Carmelo, had stated that he had been identified by several witnesses. What she said was that what he was manifesting was part of his condition, and they should expect that that would escalate, and you will find that at the transcript of her testimony, it is docket 252, page 8, that is also within the appendix. As to the matter of the DNA testimony, if you'll allow me a moment, you will find that, first, I don't really understand what's the difference about putting a report into evidence and having somebody testify about that report before the jury. It is still hearsay. It was still evidence that came in about a report. Even if the report was not placed into evidence, she was reading from the results that were obtained by other technicians. So there is really no difference if the report was admitted into evidence as the report itself or if it was admitted into evidence as Carlson's statements reading the report. There is really no difference. The Williams case clearly states that there is a difference between what lab technicians do in a matter that is not testimonial, not directed towards the prosecution of the person, which was what happened in Williams. This was like some sort of website-induced, we send in our DNA and we get it and then we use that to connect it to the evidence of the crime. These were analyses that were made, Judge Thompson, specifically for the case, specifically for the prosecution. Therefore, Williams is not applicable here. There is a difference. I don't see what this report adds to this case. It was overwhelming evidence otherwise. I think this is just the U.S. Attorney's Office creating issues that we shouldn't have before us. And you can carry that message back. I do think, Judge Torreira, that it does have weight because then all that you have, other than the DNA evidence, is witness testimony whose credibility can be attacked in cross-examination. But the evidence, the solid evidence was in the record. I mean, I'm only speaking for myself. That's how I feel. Notice to the first count, which is the Mieses count, which is the sole count that happens on the 18th of June before the arrest, that crime occurs alone that day. All the other crimes are somehow connected, but not that one. Thank you. Thank you.